**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ASTROTEL, INC.,**

       **Plaintiff,**

**vs.**                                **Case No. 8:11-cv-2224-T-33TBM**

**VERIZON FLORIDA, LLC, and**
**VERIZON COMMUNICATIONS, INC.,**

       **Defendants.**

_____/

## SECOND AMENDED COMPLAINT

Plaintiff, **ASTROTEL, INC.**, (**"AstroTel"**), by and through its undersigned counsel, timely files this second amended complaint against **VERIZON COMMUNICATIONS, INC.**, and **VERIZON FLORIDA, LLC** (collectively, **"Verizon"**), and alleges:

### GENERAL ALLEGATIONS

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and pursuant to the referral to this Court of cases under Title 11 and proceedings arising under, arising in, or related to Title 11 cases pursuant to 28 U.S.C. § 157(a).

2.    This is a core proceeding which may be heard by the Bankruptcy Court pursuant to 28 U.S.C. § 157(a) and 28 U.S.C. § 157(b)(2)(A) and (O).

3.      On December 16, 2010, AstroTel filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the Main Proceeding, Case No. 8:10-bk, 29992-MGW.

4.      On December 25, 2010 AstroTel filed an Application for Authority to Employ the undersigned counsel (Main Proceeding Doc. No. 15), and on December 27, 2010 the Court entered an order approving the application for the undersigned counsel to represent AstroTel as Debtor-in-Possession (Main Proceeding Doc. No. 16).

5.      This is an action for injunctive relief and damages arising out of the unlawful and anticompetitive conduct of Verizon Communications, Inc., and its defendant subsidiary Verizon Florida, LLC. (collectively, **"Verizon"**) against AstroTel, Inc. (**"AstroTel"**).   A multi-billion dollar company, Verizon is an heir to America's longest-lasting and most successful monopolist. Like that of its corporate ancestors, Verizon's course of conduct is a textbook example of abuse of monopoly power. At virtually every turn, Verizon has attempted to stifle competitive entry into the markets it controls, either by denying access to essential facilities or by using its control of those facilities to impose such severe costs, delays, and other restraints on new competitors as to make competition virtually impossible. Verizon's business strategy is to preserve its inherited monopoly by preventing competitors from offering consumers better

products and services at lower prices. By implementing this strategy, Verizon can continue to sell the same inferior products and services at the same inflated prices, to the detriment of AstroTel, consumers, and competition.

6.    After enjoying significant growth as a protected monopolist, Verizon inherited the ownership and control of all the physical infrastructure that makes the provision of telephone service possible. The control of these physical assets is the lynchpin of Verizon's monopoly in the "basic local services" market for provision of local telephone service to small-and medium-sized businesses, described in more detail below. Moreover, Verizon has exploited its monopoly of the basic local services market to obtain an equally dominant share of the burgeoning market for "enhanced services," such as voice mail and internet access.

7.    AstroTel has sought to compete with Verizon and provide consumers better products and services at cheaper prices. Founded in 2001, AstroTel is based in Bradenton, Florida and now provides basic local telephone service, enhanced services, and internet access services to residential consumers and small-to-medium size businesses within the state of Florida. Of course, neither AstroTel nor anyone else can duplicate the vast physical infrastructure that quite literally connects every house and office that has phone service to every other house and office. AstroTel is no mere

reseller of that infrastructure.   To the contrary, AstroTel operates its own telecommunications network which serves more than half of the state of Florida.

8.     Verizon has engaged in a wide variety of schemes and artifices designed to unlawfully protect and exploit its monopoly power and thwart AstroTel's ability to operate. Verizon has embarked on a conscious strategy of using its control of essential facilities to obstruct AstroTel's ability to serve telecommunications subscribers, and to drive up AstroTel's costs so that AstroTel cannot profitably provide products and services that customers want. In particular, Verizon has committed the following acts, among others:

a)Illegally cross-subsidized its unregulated services such as Internet Access Services, wireless mobile telephone service and television service with its regulated local telecommunications services.  This has created an illegal price squeeze in an effort to prevent AstroTel and others from competing in the market for local telephone service;

b)Consistently failed to install service ordered by AstroTel on-time with the same diligence which it provides for its own retail subscribers;

c)Consistently failed to meet due dates provided to AstroTel (and then by AstroTel to a subscriber) with no reasonable explanation;

d)Consistently failed to provide adequate information to its own field

installers to install or repair AstroTel service, and then directed its installers to close AstroTel's install orders as completed rather than actually completing the installation;

e)Repeatedly falsified its own records to indicate that it has installed service ordered by AstroTel, when in fact the service was not installed;

f)Repeatedly initiated billing for service based upon the foregoing falsified records, when in fact the service was not installed and Verizon knew or should have known that the service was not installed;

g)Repeatedly forcing AstroTel to visit a customer premise, then open new repair tickets when service was not installed but the order was marked completed, causing service delays, disruptions and outages for AstroTel subscribers and severe manpower drains upon AstroTel;

h)Intentionally and repeatedly forced AstroTel to invoke government processes not to resolve a bona fide dispute, but instead to force AstroTel to expend time and resources in regulatory proceedings to obtain Verizon's compliance with established regulations and interconnection agreements. These repeated actions by Verizon have delayed provision of basic local and enhanced services to AstroTel subscribers, and perpetuated service quality issues for AstroTel subscribers which were solely caused by Verizon.  These repeated and willful actions were detrimental to both the subscriber and to AstroTel, and substantially damaged AstroTel's

reputation.  Even after numerous findings by state regulators that Verizon was in violation of its obligations, Verizon has continued its illegal behavior without any noticeable attempt to remedy;

i)In connection with its actions to delay and impair the service of AstroTel's subscribers, Verizon has embarked upon a malicious campaign of disparagement, misrepresenting the products and services that AstroTel provides to the public, and unfairly disparaging AstroTel's reputation.  In many cases, Verizon itself has caused service issues for AstroTel subscribers, failed or refused to timely and properly install or repair service, and then illegally contacted AstroTel subscribers to tell them that they would get better service and more diligent repair services as a Verizon subscriber.   In that campaign, Verizon has told AstroTel subscribers that AstroTel is a simple reseller of Verizon's service and functions solely as a useless "middleman", has told AstroTel subscribers that Verizon subscribers will get superior service over what Verizon provides to AstroTel customers, has told AstroTel subscribers that Verizon subscribers will get superior repair response to what Verizon provides to AstroTel customers, and has made other disparaging remarks to AstroTel customers;

j)Deliberately failed to provide timely information about customers terminating their service with AstroTel (information that Verizon has under

its exclusive control, by virtue of its control of the essential facilities), causing AstroTel to improperly bill former customers, and resulting in unnecessary expenditures on account management and regulatory proceedings;

k) Deliberately supplied false bills to AstroTel for services it has not ordered or received, services which were ordered but never provided, services which had been previously ordered disconnected, or services billed at rates substantially higher than those approved by state regulators;

l) Deliberately refused to work with AstroTel or AstroTel's agents in good faith to resolve issues surrounding the false bills and non-received bills, but instead continued to send false bills and to repeatedly threaten disconnection of AstroTel's subscribers and facilities for non-payment of the false bills which AstroTel had disputed in good faith, and non-payment of the bills which Verizon had been notified that AstroTel did not receive and which Verizon still failed to send;

m) Deliberately and repeatedly used confidential, protected Customer Proprietary Network Information ("CPNI") provided by AstroTel during the course of wholesale ordering for Verizon's own marketing purposes, illegally attempting to entice AstroTel subscribers to switch to Verizon instead;

n) Attempted to require AstroTel to purchase unnecessary additional

Verizon services in order to connect to the public 911 Emergency Network which Verizon operates on behalf of six Florida counties, and then refused to stop billing for and to reverse charges for those unnecessary services even after the Florida Public Service Commission found that it should do so;

o)Failed or refused to provide access to facilities information, so that AstroTel can effectively determine if it can provide specific services to a specific subscriber's address.  This data is provided to Verizon's affiliate companies, and without this data AstroTel must actually order and pay for service to a certain address and then wait an average of ten days for installation before it can determine whether the service will actually work at that address;

p)Eliminated its "CLEC Specialist" and other staff members who were charged with addressing problems for CLEC subscribers, and by doing so deliberately created an environment where CLECs such as AstroTel are entirely unable to get Verizon-caused installation, repair, directory listing or billing issues resolved in a timely manner.

9.      These acts, individually and in combination, constitute a deliberate scheme to maintain and even expand Verizon's monopoly power by exclusionary, anticompetitive, and illegal means. By engaging in these acts, Verizon has committed flagrant violations of the federal antitrust

laws prohibiting monopolization and attempts to monopolize. They further constitute and evidence violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").   Verizon's conduct also violates state laws prohibiting breach of contract, tortious interference, unfair competition, and business disparagement and defamation.

10.     As a consequence of Verizon's unlawful conduct, AstroTel has wrongfully been prevented from entering or expanding in markets dominated by Verizon and has suffered millions of dollars in damages to its business or property. In addition, competition has been injured and consumers have been harmed by, among other things, being deprived of the valuable and innovative services that AstroTel can provide. By filing this case, AstroTel requests that this Court compel Verizon to remedy the damages inflicted upon AstroTel as a result of Verizon's unlawful and anti-competitive acts, and further that the Court order Verizon to refrain from engaging in such acts in the future. In sum, AstroTel asks that the competitive balance envisioned by the antitrust laws be enforced, and that the injuries suffered by AstroTel be redressed.

## JURISDICTION AND VENUE

11.     This is a civil action arising under federal law. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. §15, and 18 U.S.C. § 1964. This Court has supplemental jurisdiction over AstroTel's

state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this District pursuant to 15 U.S.C. § 22, 15 U.S.C. § 15, and 28 U.S.C. § 1391(b) and (c). Verizon Florida, LLC resides in, has an agent in, and transacts business in the Middle District of Florida.  Verizon and its subsidiaries operate as a single business entity, such that all defendants are subject to personal jurisdiction in the Middle District of Florida and thus may be considered to reside in the Middle District of Florida. Furthermore, all of the events or omissions giving rise to AstroTel's claims were implemented within Verizon's Florida service area, which entirely resides within the Middle District of Florida. Alternatively, defendant Verizon Florida, LLC resides in the Middle District of Florida, and there is no district in which the action may otherwise be brought. Therefore, venue is proper in the Middle District of Florida.

## PARTIES

13.     Plaintiff AstroTel is a Florida corporation with its principal place of business in Bradenton, Florida. AstroTel does business throughout the State of Florida, including the Middle District of Florida.

14.     Defendant Verizon Florida, LLC is a Florida limited liability company with its principal place of business in Tampa, Florida.

15.     Defendant Verizon Communications, Inc. is a Delaware corporation, with its principal place of business in New York, New York.

16.     Verizon and its subsidiaries, which are collectively and appropriately referred to as "Verizon" throughout this complaint, effectively operate as a single enterprise. Verizon controls its subsidiaries to such a degree that they act as its instrumentalities. Verizon also operates nationwide under a single Verizon brand. Verizon has perpetrated the wrongs of which AstroTel complains in part through its subsidiaries, which serve as instrumentalities acting on Verizon's behalf and on their collective behalf, or as Verizon's agent or alter ego. Verizon operates a single wholesale operation on behalf of all the Verizon subsidiaries.

## BACKGROUND

### I. *The Nature of AstroTel's Competition With Verizon*

17.     AstroTel is a telecommunications company that competes against Verizon to provide telephone service to residential and small and medium-sized business subscribers. Verizon has a stranglehold on certain physical assets necessary to provide such services, and AstroTel can only provide these services if it has access to these facilities. Thus, AstroTel leases these essential facilities from Verizon and combines them with AstroTel's own equipment and services to meet the needs of its subscribers.

### II. *The Nature of Trade and Commerce Involved*

18.     The relevant product markets at issue in this case are: (1) basic analog local dial-tone service ("basic local service") to residences and small to

medium-sized businesses, which is the service of connecting one customer to another within a locality via telephone lines or wires, (2) "enhanced services," which are additional features that purchasers of basic local service can add to their telephone service, such as voice mail and other features such as internet access service.

**a. Basic Local Services Product Market**

19.   Each dial-tone customer has at least one twisted copper pair telephone line ("line") from his or her home or small business, which is connected to a "central office." These customer-specific telephone lines are referred to in the industry as the "local loop." At the telephone company's central office, residential and small business telephone lines converge and are connected to the rest of the local telephone and internet network, much like a hub-and-spoke system.

20.   "Switches" at the central office route incoming calls based on the number dialed, taking the place of the telephone operator of old who manually connected a caller with the recipient of the call. When a call is made to a customer not connected directly to the caller's central office, the call is transported from the caller's central office to the intended recipient's central office. In industry parlance, "transport" refers to the transmission facilities that make this connection possible, including telephone poles, conduits, ducts, rights of way, and other hard assets. If the central offices

are not directly connected by transport, then the call is transported to one or more "tandem switches," which are generally contained in intermediary central offices that join central offices and allow a call to eventually be transported to the intended recipient's central office, where it is then connected to the recipient's local loop. The last elements needed for the actual connection of callers are the "operations support systems," which are the services and equipment necessary to operate, maintain, and repair these assets.

21.     The local loop, the switches at the central office, the transport, the tandem switches, and the operations support systems are all essential to the provision of basic local services to residences and small to medium-sized businesses. Large businesses requiring multiple lines are not part of the relevant market. Basic local service to large business may, in some instances, be provided economically by multiple telecommunications carriers, unlike residences and small-to-medium-sized businesses. It is uneconomic, inefficient, commercially impracticable, and, in most cases, technically infeasible to duplicate the facilities necessary for basic local service, and access to these facilities is thus essential to competing in the provision of telecommunications services in the basic local services and internet access service markets for residences and small-to-medium-sized businesses.

22.  AstroTel leases access to the essential portions of Verizon's network, *i.e.*, the local loops, transport, central office real estate for its own network equipment, and operations support systems - so that it may provide basic local services. Standing alone, however, the network made up of these facilities represents only raw capacity, rather than a finished service. To provide basic local service or internet access service, AstroTel must combine the leased capacity with, among other things, its own network and switches, customer service, account management, and billing and collection.  It must also undertake the complicated work of charging (and paying) other carriers for sending and receiving calls. For example, when a competing carrier's customer calls an AstroTel customer, AstroTel may be entitled to collect a fee for completing the call.  Similarly, AstroTel may owe such a fee to another carrier when one of its customers calls a customer served by another carrier. AstroTel operates its own call center and its account management staff comprises the majority of its employees. These activities may add as much to the cost of providing basic local service as do the components of the network leased from Verizon.

23.  In the geographic markets at issue in this complaint, Verizon is the sole owner of the facilities required to provide basic local services. Verizon, accordingly, is known in industry parlance as the incumbent local exchange carrier, or "ILEC." AstroTel, along with other entities that seek

to compete with an incumbent carrier is known as a competitive local exchange carrier ("CLEC" or "competitive carrier").

**b. Relevant Geographic Markets**

24.    The relevant geographic market at issue is the Verizon incumbent operating territory in the state of Florida. Verizon operates as the incumbent carrier, or ILEC and AstroTel operates as a competitive carrier or CLEC.

### III. *Verizon's Monopoly and its Long History of Antitrust Scrutiny*

25.    For most of the history of telephone service in the United States, the provision of local and long-distance telecommunications services, as well as the sale of telecommunications equipment, was dominated by a single company, AT&T, which owned Bell Atlantic, Verizon's predecessor. Competition was non-existent. In the 1970's, however, the U.S. Department of Justice (DOJ) sued AT&T, alleging violations of the monopolization provisions of the Sherman Act. In particular, the DOJ alleged that AT&T had abused its local service monopolies in an attempt to monopolize long-distance service and other markets. The end result of this suit was the most extreme of judicial remedies: the break-up of AT&T pursuant to a consent decree entered in 1983.

26.    Although this decree introduced competition into the long-distance market and the telephone equipment manufacturing market, the basic local

services market remained a bastion of monopoly. The break-up of AT&T led to the creation of the original Regional Bell Operating Companies ("RBOCs"), which continued to provide price-regulated basic local service as monopolists.   Among the original RBOCs were The Bell Telephone Company of Pennsylvania, New Jersey Bell Telephone Company, The Diamond State Telephone Company, The Chesapeake and Potomac Telephone Company, The Chesapeake and Potomac Telephone Company of Maryland, The Chesapeake and Potomac Telephone Company of Virginia, and The Chesapeake and Potomac Telephone Company of West Virginia and NYNEX.  All of these later became known as simply "Bell Atlantic", and then in the year 2000 combined with GTE to become Verizon.

27. Verizon enjoys ownership and control over the ubiquitous physical facilities that form the massive local telecommunications and enhanced services network in the geographic areas in which it operates. Those physical facilities include, among other things, local loops, switches, transport, central office real estate, and operations support systems. Without access to these physical assets, effective competition in the local services markets is impossible. As a result of its control of those assets, Verizon enjoys, on information and belief, a market share of more than 75% in the basic local services market in all the relevant geographic

market.

**IV.** *The Need for Access to Verizon's Network*

28.     To compete against Verizon in the basic local services market in the relevant geographic markets, potential competitors require access to essential facilities, which are part of the local telephone network over which Verizon exercises total control: (1) the local loops that connect subscribers to Verizon central offices, (2) switching to permit calling between Verizon subscribers and AstroTel subscribers, (3) "shared transport," or high capacity lines that connect originating and terminating switches and tandem switches, (4) Central Office Real Estate, for AstroTel to install its own equipment into a Verizon Central Office to connect to the leased loops that serve subscribers, and (5) operations support systems to provide, operate, and repair the local loops. It is not economically feasible to duplicate Verizon's local facilities.

29.     Access to each of these facilities is necessary to ensure that there is a connection between AstroTel's network and its subscribers. These facilities, among other elements of Verizon's network, are thus absolutely essential to AstroTel's business and its ability to compete.   To have a meaningful opportunity to compete, AstroTel's access to these essential facilities must be dependable, timely, and non-discriminatory.   Delaying access or installation, demanding exorbitant fees, or failing to make timely

repairs effectively thwarts competition.  Verizon has excess capacity that would permit it to provide access without affecting its own ability to provide basic local and enhanced services to customers.

**V. *Verizon's Predatory Responses to AstroTel's Competitive Threat***

30.    Since 2001, AstroTel has engaged in a concerted effort to enter the basic local and enhanced services markets in the state of Florida to provide competitive, innovative services to customers in those markets.  Verizon, however, has used its monopoly control over the local network to erect roadblocks to competition.  Implementing a business plan conceived at the highest levels of the company, Verizon has employed a variety of tactics with one unshakeable goal: to protect and defend the monopoly that it inherited and to defeat and dismantle competition in any possible manner. To achieve this goal, Verizon has undertaken a variety of actions for the sole purpose of preventing the erosion of its monopoly power. Among other things, Verizon has abused its monopoly power by:

a) Illegally cross-subsidized its unregulated services such as Internet Access Services, wireless mobile telephone service and television service with its regulated local telecommunications services.  This has created an illegal price squeeze in an effort to prevent AstroTel and others from competing in the market for local telephone service;

b) Consistently failed to install service ordered by AstroTel on-time with

the same diligence which it provides for its own retail subscribers;

c)Consistently failed to meet due dates provided to AstroTel (and then by AstroTel to a subscriber) with no reasonable explanation;

d)Consistently failed to provide adequate information to its own field installers to install or repair AstroTel service, and then directed its installers to close AstroTel's install orders as completed rather than actually completing the installation;

e)Repeatedly falsified its own records to indicate that it has installed service ordered by AstroTel, when in fact the service was not installed;

f)Repeatedly initiated billing for service based upon the foregoing falsified records, when in fact the service was not installed and Verizon knew or should have known that the service was not installed;

g)Repeatedly forcing AstroTel to visit a customer premise, then open new repair tickets when service was not actually installed but the order was marked completed by Verizon, causing service delays, disruptions and outages for AstroTel subscribers and severe manpower drains upon AstroTel;

h)Intentionally and repeatedly forced AstroTel to invoke government processes not to resolve a *bona fide* dispute, but instead to force AstroTel to expend time and resources in regulatory proceedings to obtain Verizon's compliance with established regulations and interconnection agreements.

These repeated actions by Verizon have delayed provision of basic local and enhanced services to AstroTel subscribers, and perpetuated service quality issues for AstroTel subscribers which were solely caused by Verizon.  These repeated and willful actions were detrimental to both the subscriber and to AstroTel, and substantially damaged AstroTel's reputation.  Even after numerous findings by state regulators that Verizon was in violation of its obligations, Verizon has continued its illegal behavior without any noticeable attempt to remedy;

i)In connection with its actions to delay and impair the service of AstroTel's subscribers, Verizon has embarked upon a malicious campaign of disparagement, misrepresenting the products and services that AstroTel provides to the public, and unfairly disparaging AstroTel's reputation.  In many cases, Verizon itself has caused service issues for AstroTel subscribers, failed or refused to timely and properly install or repair service, and then illegally contacted AstroTel subscribers to tell them that they would get better service and more diligent repair services as a Verizon subscriber.  In that campaign, Verizon has told AstroTel subscribers that AstroTel is a simple reseller of Verizon's service and functions solely as a useless "middleman", has told AstroTel subscribers that Verizon subscribers will get superior service over what Verizon provides to AstroTel customers, has told AstroTel subscribers that Verizon

subscribers will get superior repair response to what Verizon provides to AstroTel customers, and has made other disparaging remarks to AstroTel customers;

j)Deliberately failed to provide timely information about customers terminating their service with AstroTel (information that Verizon has under its exclusive control, by virtue of its control of the essential facilities), causing AstroTel to improperly bill former customers, and resulting in unnecessary expenditures on account management and regulatory proceedings;

k)Deliberately supplied false bills to AstroTel for services it has not ordered or received, services which were ordered but never provided, services which had been previously ordered disconnected, or services billed at rates substantially higher than those approved by state regulators;

l)Deliberately refused to work with AstroTel or AstroTel's agents in good faith to resolve issues surrounding the false bills and non-received bills, but instead continued to send false bills and to repeatedly threaten disconnection of AstroTel's subscribers and facilities for non-payment of the false bills which AstroTel had disputed in good faith, and non-payment of the bills which Verizon had been notified that AstroTel did not receive and which Verizon still failed to send;

m)Deliberately and repeatedly used confidential, protected Customer

Proprietary Network Information ("CPNI") provided by AstroTel during the course of wholesale ordering for Verizon's own marketing purposes, illegally attempting to entice AstroTel subscribers to switch to Verizon instead;

n)Attempted to require AstroTel to purchase unnecessary additional Verizon services in order to connect to the public 911 Emergency Network which Verizon operates on behalf of six Florida counties, and then refused to stop billing for, and to reverse charges for, those unnecessary services even after the Florida Public Service Commission found that it should do so;

o)Failed or refused to provide access to facilities information, so that AstroTel can effectively determine if it can provide specific services to a specific subscriber's address.  This data is provided to Verizon's affiliate companies, and without this data AstroTel must actually order and pay for service to a certain address and then wait an average of ten days for installation before it can determine whether the service will actually work at that address;

p)Eliminated its "CLEC Specialist" and other staff members who were charged with addressing problems for CLEC subscribers, and by doing so deliberately created an environment where CLECs such as AstroTel are entirely unable to get Verizon-caused installation, repair, directory listing

or billing issues resolved in a timely manner.

31.     Verizon also has deliberately abused government processes to prevent competitive entry of AstroTel and other carriers, by forcing AstroTel to complain to state regulators over and over about the same violations by Verizon. Verizon's anticompetitive actions involved the sacrifice of short-term profits and goodwill for the purpose of unlawfully preserving Verizon's monopoly and thwarting competition in the long-run.

### VI. Verizon Has Engaged in Exclusionary Conduct by Cross-Subsidizing, Participating in an Illegal Price Squeeze Designed to Exclude Competition

32.     In a further effort to exclude competition, Verizon has engaged in an illegal price squeeze designed to achieve anticompetitive results to preclude AstroTel from competing in the market for basic local service and internet access service. AstroTel leases elements of Verizon's network at wholesale prices set by state regulators. In contrast, if the subscriber purchases non-regulated services from Verizon or its affiliates such as wireless mobile telephone service, internet access service, or television service, Verizon offers regulated basic local telephone service to retail customers at rates that are believed to be significantly below both its reasonable cost to provide that service and significantly below AstroTel's wholesale cost from Verizon for the network elements needed to provide the same service     The end result is an illegal price squeeze in which Verizon has taken advantage of AstroTel's status as both a competitor and

a customer.

a) **Verizon's Abuse of its Network Ownership to Raise AstroTel's Costs and Exclude Competition**

33.    Verizon has abused its ownership of the essential network facilities through a conscious scheme designed to raise AstroTel's costs in order to maintain or enhance Verizon's monopoly power and to engage in other exclusionary conduct. Examples of this scheme include, but are not limited to, its failure to provide complete, accurate, and timely line loss information, repeated and willful falsification of installation and repair records, repeated failure to meet installation and repair due dates and its false and fraudulent billing practices.

    i.   **Verizon has Engaged in Exclusionary Conduct With a Strategy to  Increase AstroTel's  "Churn" Rate by Failing to Provide Complete, Accurate, and Timely Line Loss Information**

34.    Because AstroTel is providing local exchange services in some areas by reselling Verizon's regulated telephone service, AstroTel does not control the switches serving each of its customers and cannot detect when such a customer has decided to switch carriers. AstroTel relies upon a faxed notification from Verizon to inform AstroTel when an AstroTel subscriber has elected to change service providers. This information is known as "line loss" information. If Verizon does not provide this information in a complete, accurate, and timely fashion, it causes AstroTel to improperly bill former customers after their discontinuance of AstroTel service,

leading to billing disputes, customer complaints, regulatory complaints and the like, all of which impose substantial costs on AstroTel and harm its reputation in the marketplace.

35.     To provide line loss information to AstroTel, Verizon transmits a single page fax to AstroTel for each resale subscriber line which it converts away from AstroTel at a subscriber's request.   Until approximately June 2010, Verizon provided this fax in most cases when it converted an AstroTel resale subscriber to itself or another carrier. From June 2010 through present, Verizon has continued to transmit the line loss notifications, but now omits the telephone number that it has converted which it previously provided on the faxed notice.   No information is provided on the notice which Verizon is now sending to AstroTel that identifies the line or the subscriber which has been converted, making the notice entirely useless. Between June 2010 and December 2010, AstroTel complained to Verizon about problems with the line loss notification by repeatedly contacting its assigned Verizon account manager, Ric Ponce De Leon.   That account manager acknowledged receipt of the emailed inquiry more than once, but failed or refused to take any action to resolve, investigate, or escalate the problem.

36.     The negative consequences on AstroTel of these errors take several forms. First, accurate and timely information on disconnections by customers is

necessary for AstroTel to audit the charges of Verizon for the essential network facilities that AstroTel leases because many of these charges are measured on a per-customer basis.   Such audits are necessary to ensure that Verizon does not charge AstroTel for facilities used to serve customers who are no longer AstroTel customers. An audit of Verizon invoices for the time period between January 2005 and December 2010 showed that less than ten percent of Verizon's invoices to AstroTel were correct and error-free.

37.   A second negative consequence to AstroTel of erroneous and untimely provision of line loss notification relates to consumer complaints. Verizon's line loss notification failings have caused AstroTel and other competitive carriers to bill customers for services subsequent to the time at which they switched to another carrier.   Customers can then be double-billed by both their new carrier and old carrier.   Some of these customers complained directly to AstroTel, some complained to the Better Business Bureau while others made formal complaints to state or federal agencies such as the Florida Public Service Commission or the FCC.   Either way, such complaints caused AstroTel to incur costs in responding to these complaints and damaged AstroTel's reputation with former, present, and prospective customers - at the time of Verizon's actions and continuing to date.

38.     Verizon's repeated and flagrant failure with respect to line loss notifications throughout the Verizon Region is not mere incompetence. Verizon's anticompetitive intent is apparent from the efficiency with which it manages to transmit this information to its own retail marketing operations when the migration is from Verizon to another carrier. When a Verizon subscriber switches to AstroTel or another competitive carrier, Verizon contacts the lost subscriber by telephone, mail or both, offering incentives if the former Verizon subscriber switches back to Verizon.

39.     Moreover, Verizon has discriminated in favor of its own retail marketers as compared to AstroTel and other carriers in terms of the substance of the information provided when line losses occur. The previous line loss notification to AstroTel included only a working telephone number, the order number for the disconnection, and the date of the disconnection, while the current line loss notification provides only the date and AstroTel's company identifier and nothing else.    However, Verizon provided its marketers with a detailed summary of the customer they lost to help Verizon win back that customer. Among the additional information that Verizon provided to its own marketers, but not to AstroTel, is information on how the customer is billed, the services actually provided to the customer, and a description of the customer's reasons for cancellation. Verizon has used this additional information to secure for

itself a competitive advantage in winning back customers who intended to leave Verizon for a competing carrier's services and thus to discriminate against the potential competitor.

### ii. Verizon has Engaged in Exclusionary Conduct by Increasing AstroTel's Costs and Harming its Business Reputation Through False and Fraudulent Billing Practices

40.  Verizon refuses to provide accurate and audit-able bills for the network facilities that AstroTel leases and refuses to provide call detail records and other information regarding alternatively billed services, cellular calls, and other types of transactions in an accurate manner and according to industry standards. Verizon often bills AstroTel for services it has not provided and bills AstroTel incorrect rates and charges for items that AstroTel has ordered. In addition, Verizon's bills lack any cross references to the applicable tariff or interconnection agreement that is the source of specific charges. As a result, AstroTel has filed literally hundreds of billing disputes with Verizon and is forced to expend undue resources on deciphering Verizon's inaccurate bills month after month as Verizon refuses to correct or even address its mistakes.   Moreover, even with AstroTel's extraordinary efforts to verify Verizon's bills, it is likely that there are additional amounts for which AstroTel has been falsely billed that AstroTel has simply been unable to detect due to the poor quality of the billing information that Verizon provides. One consequence of the

dearth of information is that AstroTel is unable to properly and accurately bill its subscribers and third parties.

41.     Further, even after AstroTel informed Verizon of its false invoices and billing inaccuracies, Verizon has repeated the false billing in subsequent months for numerous items and failed to respond to the vast majority of AstroTel's billing disputes.     Similarly, Verizon has billed AstroTel for items for which it is not entitled to bill under explicit state commission findings, and then threatened to disconnect AstroTel's customers and to refuse to accept new service orders from AstroTel when AstroTel refused to pay such disputed amounts. Verizon's conduct is nothing more than a thinly veiled effort to use intentional, manufactured billing errors as a basis for accomplishing its anticompetitive ends. Thus, Verizon's conduct in repeatedly submitting false bills to AstroTel is intentional and/or reckless.

42.     In several instances, Verizon has attempted to collect from AstroTel amounts which it alleges are past due but for which it has not properly billed to AstroTel.     Despite numerous disputes, Verizon continues to demand payment for amounts not properly billed, and threatens to disconnect AstroTel's facilities and subscribers for nonpayment of the amounts for which it has repeatedly failed to deliver bills.

43.     Verizon also fails to provide call records in an accurate manner and

according to industry standards. Despite this failure, Verizon still demands that AstroTel collect certain fees related to such calls on Verizon's behalf. Verizon also has engages in "self-help," refusing to pay AstroTel amounts owed by Verizon for terminating the calls of  Verizon subscribers in retaliation for other types of billing disputes submitted by AstroTel.   In refusing to pay AstroTel's properly billed and documented charges, Verizon fails to produce any verifiable dispute nor any evidence whatsoever to support its refusal to pay.

44.     Nor does Verizon have in place an efficient mechanism to resolve billing disputes. Often, Verizon's billing analysts have insufficient knowledge or understanding of the essential network facilities and the corresponding rate elements that apply for providers such as AstroTel. AstroTel's complaints about Verizon's billing practices are not merely routine performance disputes. They constitute a direct and substantial means by which Verizon maintains its monopoly power in the local dial-tone and enhanced services markets. By maximizing inefficiencies in resolving billing disputes, Verizon is able to impose greater costs on AstroTel and other competitive carriers, thereby impeding their ability to compete.

45.     The failure of Verizon to provide accurate and timely bills and call records to AstroTel unduly hinders AstroTel's business operations and planning and, thus, its ability to provide service in competition with Verizon. The

US DOJ and the FCC have both recognized that improper billing can have a substantial anticompetitive effect; indeed, the US DOJ has acknowledged that "proper billing is essential to competition" Both agencies have recognized "that undependable billing diverts CLEC resources to bill reconciliation and bill correction, hampers CLEC ability to raise capital because improper overcharges are carried on the CLEC's financial reports, diminishes CLEC capacity to adjust prices and expenses in response to competition, and deprives CLECs of revenue because they are unable to backbill previously undercharged end users."

**b. Verizon's Abuse of Government Processes**

46.  Verizon repeatedly has failed or refused to properly install service for AstroTel and its subscribers, failed or refused to properly repair its facilities serving AstroTel's subscribers, and made numerous repeated "errors" pertaining to AstroTel's subscribers.   Verizon has developed a business process for ordering and repair activity, which AstroTel is forced to use, which is clearly designed to prevent AstroTel and its subscribers from obtaining timely installation or repair of the essential facilities provided to AstroTel and its subscribers by Verizon.  This process began when Verizon eliminated its "CLEC Specialist" staff, whose job it was to address ordering, installation or repair issues which were not resolved through its automatic processes.   Verizon's current business process

eliminates the CLEC's ability to have human contact in many cases, providing a sole remedy of opening an on-line ticket for any problem that may arise with ordering or repair.   Such tickets have routinely gone unanswered for days or weeks at a time.   Verizon's sole remedy for this routine issue is a process which it refers to as "escalation".   This process involves accessing the same system which failed to result in the proper installation or repair in the first place, which then was used to open an on-line ticket which has not been responded to, and which the CLEC is then advised to access for at least a third time to mark the on-line ticket as "escalated".   In AstroTel's experience, this has had no actual effect.   Then, once Verizon has failed to respond to one or more escalation attempts, AstroTel is advised to wait another 24 hours and then contact a list of "escalation contacts" provided on Verizon's website.   These escalation contacts most often do not answer calls or return voicemail messages, and several times have advised that they no longer handle escalations at all and don't know why they are on Verizon's escalations list.   If AstroTel is actually ever able to get Verizon's attention, it is generally after hours of effort and days or weeks of delay, and the likelihood of AstroTel retaining the subscriber is slim to none.   Therefore, this has left AstroTel no reasonable recourse other than the filing of regulatory complaints with the Florida Public Service Commission to attempt to gain Verizon's

compliance. Despite the Florida PSC's findings overwhelmingly in AstroTel's favor that its handling of AstroTel issues is unreasonable and in violation of regulatory rules, Verizon has continually failed to correct its anti-competitive business processes which are at the heart of this issue.

47. Verizon routinely falsifies records to falsely claim that it has met regulatory guidelines. AstroTel has dozens of examples where Verizon has falsified its own records to reflect that it has installed or repaired service for an AstroTel subscriber, when in fact it has not done so. AstroTel has evidence which shows that Verizon employees were not given adequate information to complete AstroTel installation orders, knew that the work had not been completed, but were told by superiors to falsify the records in an apparent attempt to appear compliant.

48. Verizon is not shielded from antitrust liability pursuant to the *Noerr-Pennington* doctrine for this conduct for numerous reasons as a matter of law and as a matter of fact, including, but not limited to, that the course of conduct and particular acts alleged herein constitute a pattern of abusive conduct made without regard to the merits that used administrative processes (as opposed to the outcome of those processes) as an anticompetitive weapon. This pattern of abusive conduct falls outside any petitioning privilege under the *Noerr-Pennington* doctrine [See *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S.

127, 135 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965).]

**c. Verizon's Campaign of Defamation and Disparagement**

49.    Verizon has also engaged in a deliberate and malicious effort to defame and disparage AstroTel's business and the business of other competitive carriers through a campaign of false statements and representations. AstroTel has submitted numerous documented examples to the Florida Public Service Commission of incidents where Verizon and its network have been the sole cause of service issues for an AstroTel subscriber, and then Verizon employees have advised the subscriber that they would get faster repair service or have fewer service issues if they switch back to Verizon.   AstroTel has also shown several documented examples where Verizon technicians have advised customers that their service outage is "AstroTel's problem" when in fact Verizon had, through malice or mistake, disconnected the customer's telephone service shortly after the customer switched from Verizon to AstroTel.  In one documented example which was submitted to the Florida PSC, Verizon advised an AstroTel customer in writing that AstroTel did not pay its bills.   In that instance Verizon admitted to the PSC that it made a "mistake" when converting the customer's service to AstroTel which resulted in more than an entire day of total service outage for the small law firm subscriber.  Based upon the

painful outage caused by Verizon and Verizon's assertions about AstroTel's failure to pay its bills, the customer broke its contract with AstroTel and switched back to Verizon.

50. On one telephone call from a Verizon marketer to an AstroTel subscriber, the marketer repeatedly stated that AstroTel is a simple reseller of Verizon service without any network of its own, named AstroTel by name as the current carrier (which violates federal law governing the use and disclosure of Confidential Proprietary Network Information), stated that by cutting out the "middleman" the subscriber would get better service directly with Verizon than it does with AstroTel, and further stated that Verizon subscribers would get more responsive repair service than AstroTel subscribers, because Verizon controls the repair service provided to AstroTel's subscribers.  The Verizon employee clearly represented that AstroTel is not an actual telephone carrier but is simply a billing agent for Verizon despite the value-added services that AstroTel combines with facilities leased from Verizon to provide basic local and enhanced services, some of which Verizon does not even offer.

### VII. Impact on AstroTel and Consumers

51. The effect of Verizon's unlawful practices is as immediate as it is obvious - Verizon has grievously injured competition and greatly harmed AstroTel by excluding it from the marketplace. Verizon has done everything it can

to prevent AstroTel from gaining any significant share of the market in its service area.   From the beginning, AstroTel was met with stall tactics, delays, and refusals to provide essential facilities, as well as fraudulent and false information designed to increase the costs of AstroTel doing business in the Verizon Region.

52.   Overall, the effects on AstroTel have been severe. Verizon's conduct has imposed hurdles that have greatly reduced AstroTel's market share in the enhanced services and basic local service markets, reduced AstroTel's revenues, significantly increased its costs and seriously damaged its reputation.

53.   As a direct and proximate result of Verizon's unlawful conduct, AstroTel's market entry has been impeded and frustrated, and AstroTel has been foreclosed from the relevant markets and has lost substantial sales, profits, and the value of its business. AstroTel has suffered and will continue to suffer harm through loss of and injury to its trade and business in that (a) AstroTel has been and will be precluded from entering into contracts for the sale of competitive basic local and enhanced services; (b) AstroTel has been and will be precluded from carrying out contracts already entered into for the sale of competitive basic local and enhanced services; (c) AstroTel has been and will continue to be harmed in its reputation and goodwill; and (d) AstroTel and other competitive service providers will be

hampered in marketing, selling and providing their services.

54.     Verizon's conduct has harmed competition and consumers in that it has
had and will continue to have the effects of (a) denying AstroTel fair
access to the basic local and enhanced services markets; (b) denying
consumers free choice in the basic local and enhanced services markets;
(c) affecting a substantial amount of commerce in the basic local and
enhanced services markets; (d) substantially lessening competition and
tending to create or maintain a monopoly in the basic local and enhanced
services markets; (e) creating higher prices for basic local and enhanced
services; (f) forcing consumers to use inferior basic local and enhanced
services; and (g) stifling the development of new and better basic local and
enhanced services.

## COUNT I - SHERMAN ACT, SECTION 2, 15 U.S.C. § 2 - MONOPOLIZATION

55.     AstroTel incorporates by reference the allegations of paragraphs 1 through
54 of this Complaint, as though fully set forth here.

56.     Verizon has monopoly power in both the basic local and enhanced services
markets in the relevant geographic market. Among other things, Verizon
owns and controls the only ubiquitous physical local telecommunications
and enhanced services network within the region.

57.     Verizon has engaged in the anticompetitive conduct described above with
the specific intent to maintain and extend its monopoly power and position

in the basic local service and enhanced services markets. Verizon's conduct has delayed and prevented AstroTel's entry into these markets in the relevant geographic market. Verizon continues to dominate that market through exclusionary conduct, to the detriment of consumers and competition.

58. As a direct and proximate result of Verizon's monopolistic conduct, competition in the relevant markets has been injured, consumers have been damaged, AstroTel has been injured, and AstroTel has been damaged in that: (i) its costs of operation have increased; and (ii) its ability to penetrate Verizon's monopoly has been frustrated and delayed, causing AstroTel to lose potential customers and profits and harming AstroTel's goodwill and reputation. AstroTel has been damaged in its business operation and has sustained damages and continues to sustain damages in an amount to be determined at trial.

**COUNT II - SHERMAN ACT, SECTION 2, 15 U. S. C. § 2 –
ATTEMPTED MONOPOLIZATION**

59. AstroTel incorporates by reference the allegations of paragraphs 1 through 54 of this Complaint, as though fully set forth here.

60. Verizon has engaged in the anticompetitive conduct described above in a willful effort and attempt to gain or continue a monopoly with the conscious object of acquiring the power to control prices or to exclude or destroy competition in both the basic local services market and in the

enhanced services markets in one or more of the relevant geographic markets.

61.     There is a dangerous probability that Verizon will succeed in its efforts to gain, perpetuate or enhance a monopoly in the basic local and enhanced services markets in all or part of the relevant geographic market. Verizon continues to dominate that market through unlawful conduct, to the detriment of consumers and competition.

62.     As a direct and proximate result of Verizon's monopolistic conduct, competition in the relevant markets has been injured, consumers have been damaged, and AstroTel has been damaged in its business or property in that: (i) its costs of operation have increased significantly; and (ii) its ability to penetrate Verizon's monopoly has been frustrated and delayed, causing AstroTel to lose potential customers and profits and harming AstroTel's goodwill and reputation.  AstroTel has sustained damages and continues to sustain damages in an amount to be determined at trial.

**COUNT III - SHERMAN ACT, SECTION 2, 15 U. S. C. § 2 –
MONOPOLY LEVERAGING**

63.     AstroTel incorporates by reference the allegations of paragraphs 1 through 54 of this Complaint, as though fully set forth here.

64.     Verizon has monopoly power in the basic local service market by virtue of its ownership of the physical assets necessary to participate in that market, including local loops, switching, transport, central office real estate and

operational support systems. In addition, Verizon has market power in the market for broadband internet access.

65.     Verizon uses its monopoly power in the basic local services market to gain an unlawful, competitive advantage in the enhanced services market.   In particular, as described above, Verizon uses its monopoly power in the basic local services market to deny and delay AstroTel's ability to combine basic local service with enhanced services, to prevent AstroTel from providing services to its subscribers, to increase AstroTel's costs in providing services relative to Verizon's costs, and to limit AstroTel's access to information on a timely basis that is necessary for AstroTel to place orders for and to provide basic local service and also enhanced services, which information is exclusively controlled by Verizon.   Verizon then often rejects AstroTel orders, sometimes after the due date that Verizon previously promised to install services, because AstroTel's order does not reflect certain facility data which Verizon refused to provide to AstroTel and which AstroTel cannot otherwise have known.

66.     Verizon also uses its monopoly power in the market to gain an unlawful, competitive advantage in the basic local services market. In particular, as described above, Verizon uses its monopoly power to deny and delay AstroTel's ability to provide basic local service to customers of Verizon's FIOS internet and/or television service.   At any address where Verizon has

deployed its FIOS internet and/or television service, as a matter of procedure Verizon destroys the copper telephone line serving that address which a CLEC could use to provide basic local telephone service or internet access service.  Although it is required to re-install such copper telephone lines if ordered by a CLEC, Verizon imposes significant installation delays in these cases and also refuses to provide essential network information to the CLEC.  This information would permit a CLEC to determine the viability of specific services at the address based upon the type and length of the copper loop, and would also permit the CLEC to place a correct order with Verizon on the first try.  This data is available to Verizon and its affiliates but not to CLECs.

67.    The unfair competitive advantage that Verizon creates for itself derives from its monopoly power in the basic local services market, and thus constitutes monopoly leveraging.

68.    As a direct and proximate result of Verizon's monopolistic conduct, competition in the relevant markets has been injured, consumers have been damaged, and AstroTel has been damaged in its business or property in that: (i) its costs of operation have increased significantly; (ii) AstroTel has lost customers and profits; and (iii) AstroTel's goodwill and reputation have been harmed.  AstroTel has sustained damages and continues to sustain damages in an amount to be determined at trial.

## COUNT IV - RICO VIOLATION

69.     AstroTel incorporates by reference the allegations of paragraphs 1 through

        54 of this Complaint, as though fully set forth here.

**A. Enterprise**

70.     Defendants are associated with an enterprise engaging in, and the

        activities of which affect, interstate commerce.

71.     Each subsidiary of Verizon Communications, Inc., including Verizon

        Florida LLC, constitutes an enterprise. In the alternative, the enterprise

        consists of an association-in-fact of Verizon and its subsidiaries including

        Verizon Florida, LLC, as recognized under 18 U.S.C § 1961(4).   The

        relationship among the members of this association is continuous and the

        enterprise and association in fact enterprise has been used and threatens to

        be used to submit false and fraudulent invoices and other information to

        AstroTel in an effort defraud AstroTel out of money, and to foreclose and

        inhibit AstroTel from participating in the basic local and enhanced services

        markets.

**B. Substantive Violations of RICO**

72.     Verizon, beginning in 2004 and continuing through the filing of this

        Complaint, has unlawfully, willfully, and knowingly maintained an

        interest in, or control of, its subsidiaries, including Verizon Florida LLC,

        directly, or indirectly, through a pattern of racketeering activity, in

violation of 18 U.S.C. § 1962(b). Verizon, through its unlawful and intentional conduct, acted to enhance or protect the value of its subsidiaries including Verizon Florida LLC, (and necessarily, Verizon's market power) in a manner directly injurious to AstroTel.

73.     Verizon, beginning in 2004 and continuing through the filing of this Complaint, has unlawfully, willfully, and knowingly conducted and participated, directly and indirectly, in the conduct of its subsidiaries', including Verizon Florida LLC, affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

74.     Defendants, beginning in 2004 and continuing through the filing of this Complaint, have unlawfully, willfully, and knowingly conducted and participated, directly and indirectly, in the conduct of the enterprises', as alleged directly and in the alternative above, affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

75.     Defendants, in addition or in the alternative, beginning in 2004 and continuing through the filing of this Complaint, unlawfully, willfully, and knowingly did conspire, combine, confederate, and agree together, and with various other persons whose names are both known and unknown, to violate 18 U.S.C. § 1962(b) and 18 U.S.C. § 1962(c), which constitute a violation of 18 U.S.C. § 1962(d).

**C. Predicate Acts/Pattern of Racketeering Activity**

43

76.     The enterprises, as alleged directly and in the alternative above, are at all relevant times continuing enterprises, engaging in predicate acts of mail, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, with the distinct purpose of defrauding AstroTel out of money and unlawfully foreclosing and inhibiting AstroTel from participating in the basic local and enhanced services markets.

77.     The predicate acts of mail and wire fraud, alleged herein, continue through the date of this Complaint and are ongoing by virtue of the continued submission of false and fraudulent invoices and other information to AstroTel in an effort to defraud AstroTel out of money and foreclose and inhibit AstroTel from participating in the basic local and enhanced services markets, all to the detriment of AstroTel and consumers in the Verizon Florida Region.  Numerous examples of this conduct exist.

78.     Verizon Florida has also maintained a continuous and consistent practice of unlawfully falsely reporting that Verizon Florida technicians connected and installed unbundled network elements ("UNE") for AstroTel customers when such facilities were and are not in fact installed, resulting in: i) leaving AstroTel's new customers without telephone service for a number of days, ii) Verizon's requiring AstroTel to enter a Verizon "repair" order as a method of completing the original new installation order, iii) causing AstroTel to have the new customers cancel service as a result of

the delays, iv) Verizon's fraudulently billing AstroTel for UNE services that are yet not installed but falsely reported as installed, and v) causing AstroTel to expend limited technician and administrative resources determining the cause of the lack of service and spending considerable time and resources inputting new Verizon repair orders, escalating installation and repair issue to Verizon's management escalation department, and contacting Verizon's senior management in an effort to solve the immediate problems of lack of telephone service for AstroTel's customers. Such practices interfered with the relationship between AstroTel and its customers, and caused, at times, the loss of AstroTel's customers, and damaged AstroTel's reputation as a telecommunications service provider with future potential customers.

79.     A Verizon Florida representative has gone so far as to inform an AstroTel business customer that if the customer had selected Verizon, the customer would have had a better repair experience because the Verizon technicians treat Verizon customers better than CLEC customers.

80.     Verizon Florida is poaching AstroTel's customers using AstroTel's proprietary information and even porting a customer, or "slamming," in violation of Section 258 of the Communications Act of 1934 and 47 CF.R. §64.1120(a)(1). Telecom carriers must receive individual subscriber consent before a carrier change may occur. Pursuant to Section 258(a),

carriers are absolutely barred from changing a customer's preferred local carrier without first complying with one of the Commission's verification procedures.  Specifically, a carrier must: (1) obtain the subscriber's written or electronically signed authorization in a format that meets the requirements of Section 64.1130 authorization; (2) obtain confirmation from the subscriber via a toll-free number provided exclusively for the purpose of confirming orders electronically; or (3) utilize an independent third party to verify the subscriber's order.   Numerous examples of this conduct exist.

81.    Based on the information provided to AstroTel by an AstroTel customer and by Verizon Florida, Verizon Florida ported an AstroTel's customer without meeting the requirements of 47 U.S.C. §258, 47 CF.R. §64.1120, and 47 CF.R. §64.1130.  Numerous examples of this conduct exist.

82.    The pattern of racketeering activity described above, presents a distinct threat of continuing unlawful activity. Defendants continue to engage in mail and wire fraud by submitting false and fraudulent invoices and other information to AstroTel in an effort to defraud AstroTel out of money and foreclose and inhibit AstroTel from participating in the enhanced services market. Such activity, consisting of multiple acts of racketeering (spanning well over 60 months and continuing), is interrelated, not isolated, and is perpetrated for the same or similar purposes by the same persons.   Such

46

activities occurred after the effective date of 18 U.S.C. §§ 1961, *et seq.*, and the last such act occurred within 10 years after the commission of a prior act of racketeering activity.

83.    Defendants, aided and abetted by each other, having devised a scheme or artifice in 2004 to defraud AstroTel out of money and to impair AstroTel's ability to compete in the basic local and enhanced services markets, did, for the purpose of furthering and executing such scheme or artifice, defraud, transmit, and cause to be transmitted by means of the mail or wire communications in interstate commerce, writing, signs, signals, pictures, or sound, in violation of 18 U.S.C. § 1341 and § 1343.

**D. Verizon's Subsidiaries Assume A Distinct Role In Facilitating And Masking Defendants' Fraud**

84.    Verizon's subsidiaries' role in the racketeering activity complained of here has been and continues to be distinct and separate from that of their parent, Verizon Communications, Inc.   Verizon's subsidiaries undertake distinct roles in facilitating the Defendants' fraudulent scheme: (1) Verizon's subsidiaries have sent AstroTel invoices by electronic communications and mail on a regular basis, beginning in 2004 to the present, that reflect charges purportedly owed by AstroTel for the use of network facilities, which fraudulently and falsely state the amount owed based on misrepresentations of the interconnection information; (2) Verizon's subsidiaries sent AstroTel regular reports on line loss information, which

beginning in July 2010 no longer contain adequate data to determine which AstroTel subscriber, telephone number or service Verizon has converted from AstroTel to itself, causing AstroTel to overcharge customers who had changed carriers, but with respect to which AstroTel had not been informed by Verizon; (3) Verizon has routinely denied AstroTel access to available facility data which is necessary for AstroTel to place orders with Verizon to provide service to its subscribers, in an effort to deny AstroTel the ability to serve those subscribers; and (4) Verizon subsidiaries have made and continue to make misrepresentations to AstroTel and to state regulators concerning the accuracy of Verizon's invoices and other information, including the available facility data. Verizon's subsidiaries' actions are all aimed at concealing, masking, and facilitating the Defendants' fraudulent scheme.   Numerous examples of this conduct exist.

85.   Verizon Florida service technicians and installers, including Verizon employees and independent contractors or third party vendors, have told AstroTel's technicians that the Verizon Florida technicians and installers receive a commission or bonus for convincing customers to purchase Verizon service instead of the intended AstroTel service.   Numerous examples of this conduct exist.

86.     Verizon Florida or its contractors have used AstroTel CPNI before, during, and after new AstroTel installations, without the permission of AstroTel, has used the AstroTel CPNI "for its [Verizon Florida's] own marketing efforts" to poach AstroTel customers and attempt to convince AstroTel's customers to move to Verizon Florida, and has in the course of those marketing efforts provided information about AstroTel that is not accurate or true. Numerous examples of this conduct exist.

87.     Verizon or its contractors ("representative(s)") improperly used AstroTel CPNI carrier proprietary information for marketing purposes.  On or about March 1, 2011, a representative of Verizon called an AstroTel representative at an AstroTel number.   The Verizon representative knew that AstroTel was the serving CLEC for the telephone without having to ask what local exchange company served the number.   Without having access to the Verizon LNP records, or to other Verizon records, the Verizon representative could not have known which local exchange company was providing service for the number she was calling.   The Verizon representative falsely called AstroTel a "reseller."   The Verizon representative stated Verizon's service was better than AstroTel's.   The Verizon representative was using Verizon's power as a monopoly provider to market Verizon services.  This activity by a Verizon representative was not isolated and similar events occurred regarding Verizon representatives

and their false statements about AstroTel, including but not limited to FIOS sales and installation.   Numerous other examples of this conduct exist.

88.   The Verizon representative was using AstroTel CPNI to contact the customer.  The Verizon representative was making false statements about AstroTel being just a "reseller."   Additionally, the Verizon representative suggested (although confirming AstroTel's experience) that Verizon technicians respond faster to repair requests from Verizon retail service customers than from a CLEC using a Verizon UNE loop even though Verizon has claimed, in responses to Florida PSC complaints by AstroTel, that Verizon provides equal repair times to CLECs and to its own customers.  This type of conduct occurred on or about November 1, 2010, and several times before and after that date.

89.   For years, Verizon representatives falsely represented themselves as agents or employees of AstroTel by failing to identify themselves to customers as Verizon employee or representatives of Verizon.   Numerous other examples of this conduct exist.

90.   Billing for services by Verizon and its representatives was done in a fraudulent manner, despite years of attempts by AstroTel to correct the problematic billing, including but not limited to Verizon's billing of AstroTel's customers for installation or repair services that Verizon or its

representatives knew had not been installed or repaired, including an incident on or about October 22, 2010, where Verizon had rejected a conversion order for a single resale line, Verizon fraudulently started billing AstroTel for two resale lines on October 27, 2010.  Significantly, the prior Verizon retail line sold by Verizon and not part of the conversion request from AstroTel's customer was billed as though the order was installed, which it was not, and billed as though AstroTel had ordered two resale lines to be converted, which AstroTel had not.   Numerous other examples of this type of conduct exist.

91.     Verizon and its representatives engaged in the pattern of fraudulently billing AstroTel customers for a transfer of service, including billing for alleged penalty payments.   Numerous other examples of this type of conduct exist.

92.     On April 28, 2011, AstroTel submitted to Verizon an order for the installation of three UNE copper loops for a new AstroTel Customer. Verizon provided a commitment date of May 4, 2011 for the installation. On May 4, 2011, Verizon falsely reported in a Verizon Service Activation Report (SAR) that the loops were installed and working.  On May 5, 2011, Verizon fraudulently started to bill for the services that were falsely reported as installed.   Numerous other examples of this type of conduct exist.

93.     On May 5, 2011, relying on the Verizon SAR completion record, an
AstroTel technician was dispatched to the customer premises.   The
technician determined that the UNE loops were not installed.   On May 6,
2011, in an attempt to complete the installation, AstroTel opened Verizon
repair tickets for the new UNE loops.   On May 23, 2011, Verizon reported
to the customer and/or AstroTel that the "repair" tickets were cleared and
complete.    Nineteen days after the Verizon install order was marked
"Complete" on May 23, 2011, the AstroTel technician verified the loops
were installed and working.     Verizon falsely reported this customer's
service as installed, fraudulently started billing for the uninstalled service,
and required AstroTel to submit repair requests to complete the
installation.  Numerous other examples of this type of conduct exist.

94.     On June 30, 2011, AstroTel submitted an invoice to Verizon for new resale
service for an AstroTel Customer, and received a Verizon commitment
date of June 30, 2011.   On June 30, 2011, Verizon issued a SAR falsely
reporting that the service was installed, and on July 1, 2011, Verizon
fraudulently started to bill AstroTel for the uninstalled service.  That same
day, AstroTel's customer reported no dial tone.  On July 1, 2011, AstroTel
opened a Verizon repair ticket with a Verizon repair commitment date of
July 5, 2011.   On July 5, 2011, five days after the June 30, 2011 Verizon
installation commitment date, the service was confirmed as installed.  The

customer at issue was without telephone service for five days as a result of Verizon's conduct, however Verizon fraudulently started billing AstroTel for the service five days before it was installed.  Numerous other examples of this type of conduct exist.

95.   On or about June 28, 2011, after Verizon agreed to install resale service for an AstroTel customer, Verizon refused to install that customer's service, claiming that the customer was connected to Verizon FiOS even though the home voice line was copper and not fiber, causing the customer to purchase service from a carrier other than AstroTel, in this case, Bright House Networks.   On June 28, 2011, AstroTel submitted a request to Verizon for new resale telephone service for the customer, and Verizon committed to install the service on June 28, 2011.  On June 29, 2011, the Verizon order showed the service pending and not installed.  On June 30, 2011, AstroTel had received no response from Verizon and AstroTel escalated the installation ticket in Verizon's WISE system.   AstroTel contacted Verizon National Market Center ("NMC") and spoke with a manager named "Joan," who stated that the customer at issue was located in a FiOS fiber served area, and that Verizon was refusing to install telephone service on existing copper lines connected to the customer's premises.  Numerous other examples of this type of conduct exist.

96.   Verizon's manager or representative "Joan" then stated that Verizon would only install resale service at the location on fiber and that the FiOS retail video installation was completed at the customer premises but that the Verizon fiber telephone service had not yet been installed.  AstroTel told the Verizon's "Joan"  that copper still existed at the customer's premises. "Joan" responded that it did not matter that there was copper at the premises, but only that FiOS was available at the premises and that, therefore, Verizon could not provide resale service for that customer.

97.   The June 2011 customer at issue reported to AstroTel that: i) she did not order Verizon's FiOS video service, ii) she did not want Verizon to install fiber, and iii) there was an existing copper telephone line connection at her home that could be used.   Shortly thereafter, the customer canceled the AstroTel order for the telephone service and ordered phone service from cable competitor Bright House Networks**.**

98.   On June 21, 2011, AstroTel placed an order with Verizon to install two new UNE copper loops for an AstroTel customer.   On June 22, 2011, Verizon placed the order in "jeopardy" claiming that UNE circuits had to be re-designed from the Sarasota Main central office, even though the subscriber at issue was served by the Verizon St. Armands Key central office, from which AstroTel provides service.

99.     Verizon manager Terry Howard explained to AstroTel that the UNE circuit should not require re-design claimed by other Verizon representatives and that any resulting "jeopardy" notice was incorrect.   Verizon manager Howard committed to work to fix the problem within the Verizon system. On June 24, 2011, Verizon representative Jamie informed AstroTel that the new commitment installation date was June 24, 2011, and that Verizon was dispatching a technician for the installation.   On June 24, 2011, Verizon falsely reported that the UNE service for the customer at issue was installed, and on June 25, 2011 Verizon fraudulently started billing for the uninstalled service.  On June 24, 2011, the customer stated to AstroTel that Verizon technicians had not been seen at the premises and that both lines were not working.  On June 24, 2011, an AstroTel technician visited the premises and determined that Verizon did not install the UNE loops. AstroTel immediately opened a Verizon repair ticket and received a commitment from Verizon to repair incomplete installations by June 27, 2011.  On June 28, 2011, the subscriber confirmed the lines were installed four days after Verizon reported the service as installed and started billing for the service.

100.    On June 20, 2011, AstroTel placed an order with Verizon, for a new UNE loop for an AstroTel customer.   AstroTel submitted an "expedite" order, which required an extra charge, in order to receive a quicker installation

for the customer at issue.   On June 21, 2011, AstroTel received an expedited installation commitment from Verizon for June 24, 2011.   On June 25, 2011, Verizon falsely reported in a SAR that the UNE loop for DSL was installed, and on June 26, 2011, Verizon fraudulently started billing for the uninstalled service.  Numerous other examples of this type of conduct exist.

101.    On July 5, 2011, an AstroTel technician determined that the Verizon UNE loop was not installed, and on the same day AstroTel opened a Verizon repair ticket and received a commitment date for July 8, 2011.  On July 8, 2011, AstroTel confirmed the UNE loop was installed and working, 13 days after the service was reported as completely installed by Verizon. Verizon fraudulently started billing AstroTel for the service thirteen days before it was installed.  Numerous other examples of this type of conduct exist.

102.    On June 3, 2011, AstroTel placed an order with Verizon for new residential resale telephone service for a customer.  Verizon committed to install the service on June 6, 2011.  On June 6, 2011, Verizon falsely reported in a SAR that Verizon had installed the service; and, June 7, 2011, Verizon fraudulently started billing for the uninstalled service.  On June 9, 2011, the customer at issue reported that service had not been installed.  In order to have the service installed, AstroTel contacted Verizon and received a

commitment date for June 10, 2011.  On June 14, 2011, the customer at issue confirmed service was installed and working, eight days after Verizon reported the service as installed.  After the incident, Verizon did not explain to AstroTel the reason Verizon falsely reported that the service was installed when it was not, nor did Verizon provide information as to the reason Verizon fraudulently started billing AstroTel for the service eight days before it was installed, and the reason Verizon required AstroTel to submit a repair ticket in order to cause the service to be installed.  Numerous other examples of this type of conduct exist.

103.   Similar to the other customer with copper wire issues, in May of 2011, Verizon falsely reported that another AstroTel customer did not have copper facilities available resulting in the installation being delayed by 6 days, and that same customer canceling the AstroTel order for telephone service.  On May 5, 2011, AstroTel placed an order with Verizon for a new DSL UNE loop for a customer and the same day received a Verizon installation commitment date of May 12, 2011.  On May 11, 2011, Verizon placed the order in "jeopardy" reporting that the Verizon technician could not find address and had given up trying to find the address.  The Verizon technician stated that he called the "Can-Be-Reached number" from the order and there was no answer. AstroTel determined that the number provided by the Verizon technician, as called and not answered, was not

the same number listed in the Verizon LSR installation order.   AstroTel immediately resubmitted the LSR to Verizon requesting that Verizon try again with the same information as before, and Verizon provided a new due date of May 16, 2011.   On May 16, 2011, Verizon representative "Kristin" informed AstroTel that Verizon placed the order in "jeopardy" stating "THIS IS FIOS AREA PLEASE REWRITE TO FIOS V236752." AstroTel called Verizon supervisor "Joan" and explained the problem to her.   On May 17, 2011, AstroTel received a voice mail from Verizon supervisor "Joan" stating Verizon was unable to locate copper facilities in the area of the customer, and she requested that an AstroTel technician locate copper loops available near the customer.   An AstroTel technician thereafter went by the customer's location and discovered a Verizon copper serving terminal next to the customer's premises, something the Verizon technician was responsible for discovering.   On May 17, 2011, AstroTel informed Verizon supervisor "Joan" about the Verizon loop information.   Supervisor "Joan" stated she would take the information back to the Verizon designers to get the order worked.   On May 18, 2011, fifteen days after the initial request, the customer at issue cancelled the order and requested refund.   After the incident, Verizon did not explain to AstroTel the reason Verizon falsely reported that the customer's premises

did not have copper facilities available when the facilities were available practically next door.

104.   For numerous customers, including a specific customer in April of 2011, Verizon falsely reported a customer's service as installed, fraudulently started billing for the uninstalled service, and required AstroTel to submit repair requests to complete the installation.   On April 24, 2011, AstroTel placed an order with Verizon to install a new UNE loop for a customer. Verizon committed to install the UNE loop the next day, April 25, 2011. On April 25, 2011, Verizon falsely reported the UNE loop as installed in the Verizon SAR, when it was not installed; and, on April 26, 2011, Verizon fraudulently started billing for the service as a completely installed service.   On April 26, 2011, the customer reported to AstroTel that the UNE loop had not been installed, and AstroTel dispatched a technician to the customer premises to confirm the report.   The AstroTel technician found that the UNE loop was not installed, and AstroTel immediately opened a Verizon repair ticket, and received a repair commitment date of April 27, 2011.   On April 27, 2011, the customer informed AstroTel that the service was working.   Verizon fraudulently started billing AstroTel for the service eight days before it was installed. This billing practice occurred repeatedly with other AstroTel customers. Numerous other examples of this type of conduct exist.

105.    An AstroTel customer called AstroTel in April of 2011, and complained that because of  telephone service conversion problems, several days of business had been lost, the business phone was out for two full days of service, and that the business was being charged to process credit cards manually because the line had not being converted properly.    The customer at issue requested AstroTel to port the number back to Verizon as soon as the service was restored.  On April 16, 2011, AstroTel submitted a Verizon supplemental LSR order to Verizon to cancel the conversion at the customer's request.   Verizon rejected the new order stating: "CANNOT SUP[plement] ORDER, ORDER IS ALREADY COMPLETE."   On April 17, 2011, Verizon started billing AstroTel for service as though it had been completed and also charged AstroTel $120.25 as a non-recurring installation charge.   On April 18, 2011, the line was converted to the AstroTel network, but the customer called and reported that the phone would not ring when called.  On the same day, AstroTel submitted a repair ticket to Verizon, and the next day a Verizon tech called and said that line had been repaired.  After finally completing the installation that had been falsely reported as installed, Verizon's senior management, informed of the problem through the Florida PSC complaint, did not inform AstroTel that Verizon had investigated and resolved the underlying persistent practice of falsely reporting service as installed when in fact the practice had not

ceased, and AstroTel continued to be subject to the practice of fraudulently billing for service that was actually not installed.

106.    AstroTel called Verizon numerous times to resolve the issues described above, among many other issues, but Verizon would not take any action or provide answers to address the problem.  Numerous other examples of this type of conduct exist.

107.    To resolve these issues, in April of 2010 AstroTel contacted Verizon Government Affairs Manager Frank App after unsuccessfully attempting to reach a Verizon escalation manager.   On April 22, 2010, Verizon manager Frank App reported to AstroTel that the copper to the customer's home was bad and required replacing which would take "48 hours" with a new due date of April 26, 2010.  On April 27, 2010, more than two weeks (sixteen days) after the initial order for service, after two repair tickets were issued one of which was falsely closed as complete, after Verizon falsely reported the service was installed on April 17, 2010, after Verizon fraudulently started billing for the service on April 17, 2010, and only after a call to Verizon's government affairs regulatory manager was made, the service for AstroTel's Customer 52 was installed and completed.   Even though Verizon's government affairs manager Frank App was aware of the installation issues related to this particular customer, and the many other similar patterns and practices with other AstroTel installations, Verizon did

not explain to AstroTel the reason that Verizon i) did not correct the persistent practice of providing installation commitment dates that expired without notice or explanation damaging AstroTel's relationships with new customers and AstroTel's image with potential future customers, ii) did not correct the continuing practice of fraudulently initiating billing for services that were not installed, iii) did not correct the persistent practice of requiring AstroTel to submit a repair ticket for service that was simply never installed, and iv) did not correct the persistent practice of fraudulently closing repair tickets that were not actually repaired.

108.    These acts, and others, lead to the loss of numerous existing customers for AstroTel, resulting in damage to AstroTel.

109.    Verizon also attempted to benefit from the illegal activity of its subsidiaries as alleged herein, and thus is not a passive victim of racketeering activity, but an active perpetrator.

110.    AstroTel relied on the Defendants' material misstatements, misrepresentations, and falsehoods and has been injured in its business or property by reason of the Defendants' violations of 18 U.S.C. § 1962(b), 1962(c), and 1962(d) and the Defendants' fraudulent conduct.

111.    As a result of the violations of 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d), AstroTel has suffered substantial damages, and pursuant to 18 U.S.C. § 1964(c), AstroTel is entitled to recover all actual damages, as

well as treble damages.

## <u>COUNT V - TORTIOUS INTERFERENCE WITH CONTRACT</u>

112.    AstroTel incorporates by reference the allegations of paragraphs 1 through 54 of this Complaint, as though fully set forth here.

113.    At all relevant times, Verizon was aware that AstroTel had contracts with a number of subscribers of AstroTel's services in the Verizon Florida Region.

114.    Verizon attempted to and did exclude AstroTel from competing in the Verizon Florida Region, in the process interfering with AstroTel ability to offer services to consumers there, including causing the cancellation of contracts to purchase AstroTel service. Verizon further improperly interfered with AstroTel's existing contracts with customers by, among other things, directly causing substantial and lengthy service outages for customers switching from Verizon to AstroTel service with the result, intended by Verizon, that AstroTel customers canceled their contracts with AstroTel.

115.    Verizon attempted to and did exclude AstroTel from competing in the Verizon Florida Region, in the process interfering with AstroTel's ability to offer services to consumers there, including causing the cancellation of contracts to purchase AstroTel's service. Verizon improperly interfered with AstroTel's existing contracts with customers by, among other things,

illegally using confidential proprietary network information to contact AstroTel's subscriber, and then by making misleading, disparaging remarks misrepresenting the nature, characteristics, and qualities of both Verizon's and AstroTel's basic local and enhanced services.  Verizon has successfully enticed AstroTel's subscribers to cancel AstroTel service and switch to Verizon service by its use of this strategy.

116.    Verizon attempted to and did exclude AstroTel from competing in the Verizon Florida Region, in the process interfering with AstroTel ability to offer services to consumers there, including causing the cancellation of contracts to purchase AstroTel service. On numerous occasions, customers switching to AstroTel were advised by Verizon that there was a "verbal contract" for multiple years of service with Verizon, in many cases which had already run its course and which Verizon claimed had automatically renewed.   Thus, Verizon advised the subscriber that it would impose substantial penalties upon the subscriber for switching to another carrier, even without a shred of evidence of the "verbal contract" and with the customer's assurance that it had not knowingly entered into such an agreement.  Verizon achieved its intended result on many occasions when the subscriber decided not to switch carriers to avoid the substantial cancellation fees created by this scheme.

117.    Verizon acted with the knowledge and intent that its conduct would

prevent AstroTel from offering competing services, in a deliberate and intentional attempt to restrain trade, injure AstroTel's business and drive AstroTel out of business in the Verizon Florida Region.

118.    Verizon's actions have been and continue to be without legal justification or excuse, and without privilege.

119.    As a direct result of Verizon's conduct, Verizon has interfered with AstroTel's ongoing business and with customer orders. Verizon has induced customers to cancel such orders.  As a direct and proximate result of this conduct, AstroTel has suffered actual damages that it is entitled to recover at trial.

120.    Moreover, Verizon's conduct was willful, malicious, wanton and demonstrated such entire want of care that it raises the presumption of conscious indifference to the consequences it would cause to AstroTel and consumers in the Verizon Florida Region, entitling AstroTel to punitive damages.

**COUNT VI - UNFAIR COMPETITION**

121.    AstroTel incorporates by reference the allegations of paragraphs 1 through 54 of this Complaint, as though fully set forth here.

122.    Verizon's wrongful conduct as described above constitutes unfair competition under the common law and pursuant to the laws of the state of Florida where defendants do business. Verizon's unfair business practices

hinder rather than promote the efficient operation of the basic local services and enhanced services markets. The nature of these practices is anticompetitive and injurious to both AstroTel and consumers of local dial-tone and enhanced services.

123.    In addition, Verizon's violation of the antitrust laws, the Telecommunications Act of 1996, RICO, and relevant states laws constitutes unfair competition.

124.    As a direct result of this actual and threatened misconduct, competition has been injured, consumers have been damaged, and AstroTel has suffered and will suffer injury and is entitled to receive all actual damages proximately caused by such conduct, as well as punitive damages.

## COUNT VII - BUSINESS DEFAMATION AND DISPARAGEMENT

125.    AstroTel incorporates by reference the allegations of paragraphs 1 through 54 of this Complaint, as though fully set forth here.

126.    Verizon's false statements made to AstroTel subscribers have defamed and disparaged the business of AstroTel.  On several documented occasions, Verizon directly caused outages or service issues for AstroTel subscribers, then while it was supposed to be repairing the outage which it directly caused it instead disparaged AstroTel's reputation, claiming that the subscriber would get more reliable service and more responsive repair of its outage if it switched back to Verizon.

127.   On one documented occasion, Verizon caused a lengthy outage for a business subscriber who had entered into a contract to switch from Verizon to AstroTel.  While it was supposed to be repairing the outage that it caused, it advised the subscriber **in writing** that AstroTel did not pay its bills to Verizon and that this was the cause of the outage.   Verizon admitted later that it had caused the outage "in error", but the customer still switched back to Verizon.

128.   On another documented occasion, Verizon willfully and maliciously disparaged AstroTel directly to its subscriber in conjunction with its illegal use of the CPNI data.   In that instance, Verizon told the subscriber that AstroTel is a simple reseller of Verizon's service and functions solely as a "middleman", told the subscriber that Verizon subscribers will get superior service to what Verizon provides to AstroTel subscribers, told the subscriber that Verizon subscribers will get superior repair response to what Verizon provides to AstroTel subscribers, told the subscriber that Verizon is in total control of its service whether it chooses AstroTel or Verizon as its local telephone carrier, and made other disparaging remarks to AstroTel's subscriber.  In fact, AstroTel pays Verizon a fee for the use of certain essential facilities of Verizon's network, pursuant to an FCC-prescribed formula that expressly incorporates a reasonable profit for Verizon. Moreover, AstroTel is far from a middleman, and instead

combines the facilities it leases from Verizon with its own network, its own equipment, its own employees, and its own customer service and account management, to provide integrated services in both the basic local and enhanced service markets. Finally, AstroTel has, contrary to Verizon's employee's implication, spent substantial sums developing and deploying new technologies and innovative products that Verizon does not even provide.

129.    All these facts were known or should have been known to Verizon at the time of Verizon's defamatory and disparaging statements. As a result, Verizon's statements were defamatory or were made negligently and without regard to the truth of the statements. Verizon's statements therefore constitute business defamation. AstroTel has suffered and continues to suffer damages as a result of Verizon's unlawful conduct, and is entitled to recover nominal, general, and special damages as authorized by law.

130.    In addition or in the alternative, each of these statements is false, not privileged, and malicious. Verizon knew the statements were false or acted in reckless disregard of the fact that the statements were false. As such, these statements constitute business disparagement. AstroTel has suffered pecuniary damages as a result of this conduct, including loss of profits and loss of goodwill, entitling AstroTel to recover actual and punitive

damages.

## **COUNT VIII - CIVIL CONSPIRACY**

131.   AstroTel incorporates by reference the allegations of paragraphs 1 through 54 of this Complaint, as though fully set forth here.

132.   Verizon entered into an agreement or understanding to act in concert with independent contractors and other third party vendors to Verizon, including but not limited to installers, customer services representatives, and sales representatives.

133.   AstroTel is aware of approximately 200 calls made by third party vendor or independent telemarketers on behalf of Verizon to customers of AstroTel.  Verizon and its third party vendors or independent telemarketers could benefit from these 200 calls through sales of Verizon's services as Verizon would either obtain the service of the account and obtain service fees, and through which the third party vendor or independent telemarketer received fees for services or commissions.

134.   These third party vendors or independent telemarketers interacted with AstroTel and made statements as to the purpose and goals of their engagement by Verizon, which statements demonstrate a conspiracy to deprive AstroTel of its rights and benefits under its contracts with Verizon.

135.   Verizon engaged these other non-Verizon employees as members of a conspiracy, with the purpose and intent of unlawfully depriving AstroTel

of its legal rights, and has taken unlawful acts in furtherance of that conspiracy, including but not limited to the contacting and unlawful solicitation of AstroTel's customers.

136.    AstroTel has been injured as a proximate result of the wrongful conduct emanating from this civil conspiracy. There is no legal justification or excuse for Verizon's actions.

<u>**COUNT IX - PERMANENT INJUNCTIVE RELIEF**</u>

137.    AstroTel incorporates by reference the allegations of paragraphs 1 through 54 of this Complaint, as though fully set forth here.

138.    AstroTel has been and will continue to be severely injured by being foreclosed and inhibited from participation in the telecommunications markets in the Verizon Florida Region. Such a broad-based, dramatic foreclosure from markets and competition will continue to cause a loss of reputation, goodwill, and competitiveness, which cannot be adequately compensated for in damages.

139.    AstroTel prays that this Court grant it a permanent injunction prohibiting Verizon from   (a) preventing its FIOS customers from purchasing basic local services from a non-Verizon carrier; (b) tying its basic local service, enhanced services and television services; (c) discriminating against AstroTel in the provision of line loss and facility information in favor of Verizon's marketing or retailing affiliates;  (d), using Customer Proprietary

Network Information (CPNI) for any purpose other than the fulfillment of AstroTel's wholesale orders with which such CPNI is submitted; (e) forcing AstroTel to seek regulatory remedy from state regulators for repeated, willful acts or omissions by Verizon which substantially harm AstroTel and consumers; (f) invoicing AstroTel for leased network facilities that are not specifically listed and cross-referenced against the applicable tariff or interconnection agreement supporting the purported charge; and (g) making disparaging, false or misleading statements about AstroTel, its products and services, and its relationship to Verizon.

140.    AstroTel is entitled to a permanent injunction because it has no adequate remedy at law.

## DEMAND FOR JURY TRIAL

AstroTel hereby demands trial by jury, pursuant to Fed. R. Civ. P. 38, on all issues so triable.

WHEREFORE, AstroTel respectfully prays:

a)That this Court declare under 28 U.S.C. § 2201 that Verizon has violated the Sherman Act, RICO, and other applicable laws;

b)That this Court enjoin Verizon and each of its officers, directors, agents, employees, successors and assigns, including all defendants, and all persons acting under, through or for Verizon, from, in any manner, directly or indirectly, (a) preventing its FIOS customers from purchasing local

telephone services from a non-Verizon carrier; (b) tying its basic local service, enhanced services and television services; (c) discriminating against AstroTel in the provision of line loss and facility information in favor of Verizon's marketing or retailing affiliates;  (d), using Customer Proprietary Network Information (CPNI) for any purpose other than the fulfillment of AstroTel's wholesale orders with which such CPNI is submitted; (e) forcing AstroTel to seek regulatory remedy from state regulators for repeated, willful acts or omissions by Verizon which substantially harm AstroTel and consumers; making disparaging, false or misleading statements about AstroTel, its products and services, and its relationship to Verizon.

c) That this Court award all actual damages incurred by AstroTel as a result of conduct of Verizon;

d) That this Court order disgorgement of all profits or other ill-gotten gains of Verizon;

e) That this Court award treble damages for violation of the Sherman Act, and RICO;

f) That this Court award punitive damages for all tortious conduct due to the willful and malicious conduct of Verizon;

g) That this Court award prejudgment and post judgment interest and the costs of this action, including reasonable attorneys' fees as allowed for

violations of the Sherman Act, RICO, and other state and federal laws; and,

h)That this Court order such other and further relief as the Court deems just and proper.


Respectfully submitted this 15th day of May, 2012.


/s/ John C. Dent, Jr.
John C. Dent, Jr., Esq.
Florida Bar No. 99242
**DENT & MCCLAIN, CHARTERED**
3415 Magic Oak Lane
Sarasota, FL 34232-1811
Telephone:  (941) 952-1070
Facsimile:  (941) 952-1094
E-mail:  JDent@DentMcClain.com
Attorneys for AstroTel, Inc.


/s/ Herbert R. Donica
Herbert R. Donica, Esq.
Florida Bar No. 841870
**DONICA LAW FIRM, P.A.**
106 S. Tampania Ave., Suite 250
Tampa, FL  33609-3248
Telephone:  (813) 878-9790
Facsimile:  (813) 878-9746
E-mail:  herb@donicalaw.com
Attorneys for AstroTel, Inc.


/s/ Christine R. Sensenig
Christine R. Sensenig
Florida Bar No. 0074276
**SENSENIG LAW FIRM, P.A.**
2033 Main Street, Suite 406
Sarasota, FL 34237

Telephone: (941) 953-2828
Facsimile:  (941) 953-2043
E-mail: csensenig@senseniglawfirm.com
Attorneys for AstroTel, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 15, 2012, I electronically filed this Second

Amended Complaint with the Clerk of Court via the CM/ECF system, which will send a

copy of this filing via electronic mail to all attorneys of record including:

Hardy L. Roberts, III, Esq.
CARLTON FIELDS, P.A.
4221 W. Boy Scout Blvd.
Suite 1000
Tampa, FL 33607-5780
Phone:  (813) 223-7000
Email: hroberts@carltonfields.com
Attorney for Defendant Verizon

Aaron M. Panner, Esq.
Christopher J. Walker, Esq.
KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone:  (202) 326-7900
Email: apanner@khhte.com
Email: cwalker@khhte.com
Attorneys for Defendant Verizon

Darryl S. Laddin, Esq.
Frank N. White, Esq.
ARNALL GOLDEN GREGORY LLP
171 17th Street N.W., Suite 2100
Atlanta, GA 30363
Phone: (404) 873-8120
Email: darryl.laddin@agg.com

Email: frankwhite@agg.com
Attorneys for Defendant Verizon

Herbert R. Donica, Esq.
DONICA LAW FIRM, P.A.
106 S. Tampania Avenue, #25
Tampa, Florida 33609
Phone: (813) 878-9790
Facsimile: (813) 878-9746
E-mail: herb@donicalaw.com
Attorneys for Plaintiff AstroTel

John C. Dent, Jr., Esq.
DENT & MCCLAIN, CHARTERED
3415 Magic Oak Lane
Sarasota, FL 34232-1811
Telephone:  (941) 952-1070
Facsimile:  (941) 952-1094
E-mail:  JDent@DentMcClain.com
Attorneys for Plaintiff AstroTel

Christine R. Sensenig, Esq.
SENSENIG LAW FIRM, P.A.
2033 Main Street, Suite 406
Sarasota, FL 34237
Telephone: (941) 953-2828
Facsimile:  (941) 953-2043
E-mail: csensenig@senseniglawfirm.com
Attorneys for Plaintiff AstroTel, Inc.